## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Case No.: 24-cr-234 (DLF) 18** |
|  | : |  |
| **v.** | : | **U.S.C. § 111(a)(1)** |
|  | : |  |
| **LEWIS WAYNE SNOOTS,** | : |  |
|  | : |  |
| **Defendant.** | : |  |
|  | : |  |

## STATEMENT OF OFFENSE

Pursuant to Fed. R. Crim. P. 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, Lewis Wayne Snoots, with the concurrence of the defendant's attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

### *The Attack at the U.S. Capitol on January 6, 2021*

1.      The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured twenty-four hours a day by U.S. Capitol Police (USCP). Restrictions around the Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the Capitol.

2.      On January 6, 2021, the exterior plaza of the Capitol was closed to members of the public.  The grounds around the Capitol were posted and cordoned off, and the entire area as well as the Capitol building itself were restricted as that term is used in Title 18, United States Code, Section 1752 due to the fact that the Vice President and the immediate family of the Vice President, among others, would be visiting the Capitol complex that day.

3.      On January 6, 2021, a joint session of the United States Congress convened at the Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on Tuesday, November 3, 2020. This joint session of Congress was an official proceeding as that term is used in Title 18, United States Code, Section 1512. The joint session began at approximately 1:00 PM. Shortly thereafter, by approximately 1:30 PM, the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4.      As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the Capitol. Temporary and permanent barricades, as noted above, were in place around the exterior of the Capitol, and USCP officers were present and attempting to keep the crowd away from the Capitol and the proceedings underway inside. By shortly after 1:00 PM, the situation at the Capitol had become a civil disorder as that term is used in Title 18, United States Code, Section 231, and throughout the rest of the afternoon the civil disorder obstructed the Secret Service's ability to perform the federally protected function of protecting Vice President Pence.

5.      At approximately 2:00 PM, certain individuals in the crowd forced their way through, up, and over the barricades. Officers of the USCP were forced to retreat and the crowd advanced to the exterior façade of the building. Officers with the D.C. Metropolitan Police Department were called to assist officers of the USCP who were then engaged in the performance of their official duties. The crowd was not lawfully authorized to enter or remain in the building

and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks as required by USCP officers or other authorized security officials.

6.      At such time, the certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured. Members of the USCP attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 PM, individuals in the crowd forced entry into the Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the Capitol, requiring the expenditure of more than $2.9 million dollars for repairs.

7.      Shortly thereafter, at approximately 2:20 PM, members of the House of Representatives and of the Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 PM on January 6, 2021. In light of the dangerous circumstances caused by the unlawful entry to the Capitol—including the danger posed by individuals who had entered the Capitol without any security screening or weapons check—Congressional proceedings could not resume until after every unauthorized occupant had been removed from or left the Capitol, and USCP confirmed that the building was secured. The proceedings resumed at approximately 8:00 PM after the building had been secured. Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### *The Defendant's Participation in the January 6, 2021, Capitol Riot*

8.      On January 6, 2021, the U.S. Capitol Police (USCP) requested assistance from the Metropolitan Police Department (MPD) and other law enforcement agencies in the area to protect

the Capitol, impede more people from entering the Capitol, and expel the crowd that was already inside the Capitol. Multiple MPD officers and other law enforcement officers came to assist, including MPD Officer M.F. As shown in open-source and body worn camera video, Officer M.F. was wearing a full MPD uniform, including a marked helmet and tactical vest, and had his police badge, duty belt, and official insignia clearly displayed.

9.      By approximately 3:00 p.m., a group of USCP and MPD officers had formed a police line at one of the two glass doorways on the lower west terrace that leads inside the U.S. Capitol building to prevent the mob from entering the building through that entrance. By approximately 3:14 p.m., Snoots entered the "tunnel" leading to those glass doorways while wearing a gas mask on the top of his head. Snoots swiftly pushed himself through other rioters to the front of the police line while lowering the gas mask to cover his face. Over the next four minutes, until approximately 3:18 p.m., Snoots moved forward and backward with the mob of other rioters seeking to overwhelm and breach the police line defending the entrance to the Capitol building.

10.     At approximately 3:15 p.m., while Snoots was actively moving forward and backward as part of the collective attempt to overwhelm and breach the police line, Officer M.F. came to the front of the police line.

11.     At approximately 3:16 p.m., another rioter assaulted officers at the front of the police line by pressing against them using a USCP riot shield. Snoots aided and abetted that assault by pressing against the riot shield and contributed his weight to forcibly pushing against the line of officers, further interfering with their ability to clear rioters from the tunnel. At approximately 3:17 p.m., when officers attempted to reclaim the shield, Snoots lifted it over his head and passed

it back to rioters behind him to keep officers from recovering it and to allow rioters to continue to use it against police officers.

12.     Beginning at approximately 3:18 p.m., as officers began to push the rioters back out from the tunnel, open-source and body worn camera video shows that another rioter named Albuquerque Head (Head) wrapped his arm around Officer M.F.'s neck and pulled Officer M.F. into the riotous mob outside the tunnel, yelling as he did so, "Hey! I got one!" As Head dragged Officer M.F. out of the tunnel, law enforcement officers advanced. As documented on open source and closed-circuit video recordings, as Snoots moved towards the mouth of the tunnel, he looked directly at Head's restraint of Officer M.F., moved closer to Officer M.F.; and he reached out and placed his hand upon Officer M.F.'s upper back from behind. As seen on video recordings, at approximately 3:19 p.m., Snoots continued to touch Officer M.F.'s upper back from behind while Head continued to drag Officer M.F. further from other police officers. Video footage shows that Officer M.F. used his hand to push against Head's chest in an effort to break Head's hold and free himself, but Head maintained control over him and pulled him further into the crowd.

13.     After Head pulled Officer M.F. into the mob outside of the tunnel, open-source and body worn camera video shows that rioters assaulted, tased, and robbed the officer of his MPD badge and police radio. In the footage, rioter Kyle Young (Young) lunged at Officer M.F. and fought with him to take his service weapon. Young placed his hands on Officer M.F.'s weapon while Officer M.F. kept his hands on top of Young's hands to prevent him from forcibly drawing the weapon from its fixed holster. Young repeatedly yelled, "I'm taking your gun!" and "Kill him!" (referring to Officer M.F.).

14.     Open-source and body worn camera video shows that another rioter, Daniel Rodriguez (Rodriguez), repeatedly tased Officer M.F. on the back of the neck. As Rodriguez did

so, open source and BWC video recordings shows that Snoots used both of his hands to partially restrain Officer M.F., grabbing hold of his right hand and pulling his right arm away from Officer M.F.'s body. The defendant's grabbing of Officer M.F.'s hand was nonconsensual and hindered and impaired both Officer M.F.'s ability to defend himself against the continuous onslaught of assaults inflicted by other rioters as well as his ability to protect his service weapon from rioters seeing to take it. Over the course of the assault by rioters, Officer M.F. was kicked, punched, pushed, grabbed, and hit with objects by the mob. Eventually, other rioters surrounded Officer M.F. to protect him from the rioters assaulting him and escorted him back to the police line.

15.     As seen on open source and body worn camera video, by the time Snoots forcibly grabbed and held onto Officer M.F.'s arm while other rioters viciously attacked him, Snoots had looked directly at Officer M.F., to include the MPD markings on the back of Officer M.F.'s police helmet and vest and on the shoulders of his uniform, and observed that the officer was engaged in the performance of official duties as an officer from the MPD who was assisting the United States Capitol Police department in the defense of the U.S. Capitol building.

16.     After Snoots assaulted an officer in the tunnel and after the assault on Officer M.F., and while still on the U.S. Capitol grounds within the restricted area, Snoots gave a video- and audio-recording interview, in which he stated:

> I'm fed up with it, everybody is fed up with it. They have tear gassed our ass off of the Capitol steps, but it's not over. What they don't understand is it's just starting. Every political asshole up in that place is now going to have a target on their back everywhere they go.

17.     As a result of the attack, Officer M.F. sustained significant and painful injuries. As another rioter, Daniel Rodriguez, repeatedly applied a taser to the back of Officer M.F.'s neck, Officer M.F. experienced excruciating pain and was rendered momentarily helpless. His body

worn camera captured his screams. The repeated tasing caused burn marks to the back of Officer M.F.'s neck that resulted in scarring. Shortly after he was tased, Officer M.F.'s body worn camera shows the efforts of those around him to elicit a response from him, indicating that he lost consciousness for more than two minutes.

18.     Officer M.F. was then transported to an emergency room, where he reported experiencing chest pain. A medical assessment revealed elevated levels of troponin and creatine kinase (CK) in his bloodstream. Officer M.F.'s medical records indicate that the elevated troponin was "likely secondary to electrical injury" and that the elevated CK was likely due to the "physical assault" that Officer M.F. suffered. Officer M.F. was admitted to the hospital overnight as a result of the elevated troponin levels. He was discharged the next day, after his troponin levels decreased and referred to a cardiologist for further evaluation. The cardiologist who subsequently assessed Officer M.F. determined that the elevated troponin levels were "likely due to muscle damage due to trauma or some degree of strain to his hear in the setting of [a] significantly stressor situation."

19.     During his hospitalization, Officer M.F. reported a throbbing headache and tenderness to his neck. As a result of the headache, which was assessed to be due to "blunt trauma," Officer M.F. was monitored for concussion-like symptoms and underwent a CT scan, which did not reveal any acute abnormalities. Officer M.F. received Toradol for pain management.

20.     For months after the attack, Officer M.F. continued to suffer from neck pain and cognitive deficits, including difficulties with memory, concentration, and focus, as well as anxiety and irritability. On February 1, 2021, Officer M.F. was diagnosed with a concussion with loss of consciousness. He was prescribed speech therapy for cognitive deficits as well as Naproxen and physical therapy for neck pain. By March 2021, Officer M.F. was diagnosed with post-concussion syndrome and post-traumatic stress reaction. By May 2021, Officer M.F. was discharged from

both physical and speech therapy, although he still suffered from occasional cognitive slowing and continued to see a neuropsychologist.

### *Elements of the Offense*

21.    The parties agree that 18 U.S.C. § 111(a)(1) requires the following elements:

a.  First, that the defendant assaulted an officer from the Metropolitan Police Department;

b.  Second, the defendant did such acts forcibly;

c.  Third, the defendant did such acts voluntarily and intentionally;

d.  Fourth, the officer assaulted was assisting officers of the United States who were then engaged in the performance of their official duties; and

e.  Fifth, the defendant made physical contact with the officer assaulted or acted with the intent to commit another felony, namely, obstructing officers during a civil disorder in violation of 18 U.S.C. § 231(a)(3).

### *Defendant's Acknowledgments*

22.    The defendant knowingly and voluntarily admits to all the elements as set forth above.   Specifically, the defendant admits that he forcibly, knowingly, voluntarily, and intentionally assaulted an officer in the lower west terrace tunnel of the Capitol by pressing against a riot shield into a police line; that the officer was assisting officers of the United States who were engaged in the performance of their official duties at the time of the assault; that the defendant made physical contact with the officer; and that the defendant acted with the intent of obstructing and impeding officers while they were engaged in the lawful performance of their duties during a civil disorder that both obstructed commerce and the performance of a federally protected function. The defendant further admits that he used violence or credible threats of violence in connection

with the offense. Finally, the defendant admits that his assault was motivated by the officer's status as a government employee.

23.     The defendant further admits that Officer M.F. sustained serious bodily injury during the crowd's assault, meaning an injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental facility, or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation. The defendant likewise admits that Officer M.F. was physically restrained during the assault.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052


By:     /s/ *Samuel White*
Samuel White
Assistant United States Attorney
601 D Street NW
Washington, DC 20530
(202) 431-4453
Samuel.white@usdoj.gov

*/s/ Monika (Isia) Jasiewicz*
Monika (Isia) Jasiewicz
Assistant United States Attorney
D.C. Bar No. 102491
United States Attorney's Office
District of Columbia
601 D Street NW
Washington, DC 20530
(202) 714-6446
isia.jasiewicz@usdoj.gov

## DEFENDANT'S ACKNOWLEDGMENT

I, Lewis Wayne Snoots, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 10/4/24

Lewis Wayne Snoots
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 10/4/24

William Lee Shipley, Jr.
Attorney for Defendant