UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 24-cr-234 |
| LEWIS WAYNE SNOOTS | |
| Defendant. | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Lewis Wayne Snoots to 71 months' incarceration (the top of the 57-to-71 month guidelines range), three years' supervised release, separate restitution amounts of $2,000 to the Architect of the Capitol and a proportionate amount to the Metropolitan Police Department reflecting Snoots's role in the assaults on Officer Michael Fanone, and a mandatory special assessment of $100.00.

## I.    INTRODUCTION

The defendant, Lewis Wayne Snoots, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million

1

dollars in losses.[1]

Snoots joined other rioters on January 6 in seeking to force his way inside the United States Capitol Building via the Tunnel located at the center of the Lower West Terrace. As part of that effort, Snoots and other rioters used their bodies to collectively push against a line of uniformed police officers from both the District of Columbia's Metropolitan Police Department (MPD) and the United States Capitol Police (USCP) blocking their access to the Capitol Building. Making his way to the front of the crowd of rioters inside the Tunnel, Snoots observed another rioter pressing a police riot shield previously taken from a USCP officer against the police line. Snoots joined the other rioter and added his weight and might to push the shield into and against the officers in the police line.

Most egregiously, Snoots actively assisted the rioters who dragged MPD Officer Fanone from the tunnel and into the larger mob of rioters creating mayhem on the Lower West Terrace. Snoots placed his hand on Officer Fanone's back before eventually restraining the officer's right hand and arm as other rioters repeatedly and brutally assaulted Officer Fanone. They did so by tasing him in the neck as he screamed in pain while other rioters threatened to use his own gun

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

against him. Officer Fanone suffered debilitating and lasting injuries that continue to afflict him to this day.

The government recommends that the Court sentence Snoots to 71 months of incarceration for his conviction for violating 18 U.S.C. § 111(a)(1). A 71-month sentence reflects the gravity of Snoots's conduct and its impact on officers in the Tunnel and on Officer Fanone.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 39, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.    Snoots's Role in the January 6, 2021 Attack on the Capitol

As the Court is aware, some of the most violent confrontations on January 6 occurred inside or near the Tunnel located at the center of the Lower West Terrace. Beginning around 2:42 p.m. when rioters broke the windows on the first set of doors inside the Tunnel, the violent and physical battle for control over the Tunnel and the adjoining doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers. At 3:14 p.m., Snoots entered the Tunnel on the Lower West Terrace, wearing a gas mask that covered his head. Snoots moved purposefully through the crowd of rioters inside the Tunnel,

pulling his gas mask down over his face as he advanced towards the police line.



*Exhibit 1: USCP surveillance video of SNOOTS (circled in red) pushing his way through the Tunnel at approximately 3:15 p.m. on January 6.*

Inside the Tunnel, Snoots joined in collective efforts to push past the line of police officers blocking access to the Capitol Building, moving himself forwards and backwards with other rioters to press their collective weight against the beleaguered police officers. *See* Exhibit 2.



*Still image from Exhibit 2: Rioter footage of SNOOTS (circled in red) joining in collective pushing against the police line.*

At around 3:16 p.m., Snoots began to press against a stolen USCP riot shield being held against the police line by another rioter. Snoots contributed his weight and force to the effort to use the stolen riot shield to push back the officers in the police line. The two still images below from Exhibit 3 show Snoots, circled in red in still images from officer Body-Worn Camera (BWC) footage, as he pushed the riot shield into the police line.



*Still image from Exhibit 3:BWC footage of SNOOTS (circled in red) pushing against the riot shield.*



*Still image from Exhibit 3:BWC footage of SNOOTS (circled in red) pushing against the riot shield.*

At 3:17 p.m., when officers in the police line attempted to reclaim the stolen USCP shield being pressed against them, Snoots helped to lift it up and pass it back through the crowd of rioters, obstructing the officers' attempted recovery of the shield and enabling rioters to retain the shield for future use.

At 3:18 p.m., as the police line began to push rioters back toward the Tunnel entrance, rioter Albuquerque Head grabbed Officer Fanone, wrapping his arm around Officer Fanone's neck and dragging him away from the police line and into the crowd. Video footage shows Head yelling "Hey! I got one!" As seen on video footage, Snoots looked directly at Head's restraint of Officer Fanone, moved toward the struggling MPD officer, and placed his hand on Officer Fanone's back. Snoots kept his hand on Officer Fanone's upper back, helping to push him out of the Tunnel and, into the riotous mob on the terrace, and away from the relative safety of the police line.



*Exh. 4: SNOOTS (in the center-left of the red box) with his left hand visible on Officer Fanone's left shoulder/back.*

Dragged down the stairs below the Tunnel and into the mob on the Lower West Terrance, Officer Fanone endured repeated assaults by rioters, who tased, kicked, punched, pushed, and grabbed him. Rioters ripped away Officer Fanone's badge and radio and tried to take his service weapon while yelling "I'm taking your gun!" and "Kill him!" In the midst of these assaults and as shown in Exhibits 5, 6, and 7, Snoots used both of his hands to restrain Officer Fanone's right hand and arm. Snoots pulled Officer Fanone's arm away from his body and hindered his ability to protect himself. With his arm restrained, Officer Fanone was left defenseless as a rioter tased his neck while he screamed in pain.

*Still Image from Exhibit 5: Snoots (in the red box) with his hands on Officer Fanone's right hand.*





*Still Image from Exhibit 6: Snoots with his hands restraining Officer Fanone's right hand.*



*Exh. 7: Officer Fanone's BWC showing Snoots's hands (red box) on Fanone's right hand.*

Eventually, other rioters on the Lower West Terrace, but not Snoots, came to Officer Fanone's assistance and moved him back to the police line, where he collapsed. The vicious assaults on Officer Fanone that Snoots facilitated caused serious and lasting injuries. *See* ECF No. 39.

Later, Snoots gave a video-recorded interview inside the restricted area on Capitol Grounds. *See* Exhibit 8. During that interview, he offered no words of remorse or regret for his actions. Rather, he made a thinly veiled threat of future violence:

> I'm fed up with it, everybody is fed up with it. They have tear gassed our ass off of the Capitol steps, but it's not over. What they don't understand is it's just starting. Every political asshole up in that place is now going to have a target on their back everywhere they go.

### III.    THE CHARGES AND PLEA AGREEMENT

On May 15, 2024, a federal grand jury returned an indictment charging Snoots with eight

counts:

- Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Count One);

- two counts of Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1) (Counts Two and Three);

- Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Four);

- Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Five);

- Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4) (Count Six);

- Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Seven); and

- Act of Physical Violence in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count Eight).

On October 10, 2024, Snoots pleaded guilty, pursuant to a plea agreement, to one count of

Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1), based

on a guilty plea entered pursuant to a plea agreement.

### IV.    STATUTORY PENALTIES

Snoots now faces sentencing on one count of Assaulting, Resisting, or Impeding Certain

Officers, in violation of 18 U.S.C. § 111(a)(1).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation

Office, Snoots faces up to 8 years of imprisonment, a term of supervised release of not more than

three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings

by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

(2007). As agreed upon by the parties in the plea agreement and echoed in the U.S. Probation

Office's presentence report, the Guidelines calculation is as follows:

Count Two: 18 U.S.C. § 111(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2 | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(3)(B) | Serious Bodily Injury to Victim | +5 |
| U.S.S.G. § 3A1.2(b)&(c) | Victim was Government Officer | +6 |
| U.S.S.G. § 3A1.3 | Restraint of Victim | +2 |
| | **Total** | **27** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | -2 |
| **Total Adjusted Offense Level:** | | **25** |

*See* Plea Agreement at ¶¶ 5(A); *see also id.* ¶ 3 (agreeing that all conduct described in the

Statement of Offense is "'relevant conduct' for the purposes of U.S.S.G. § 1B1.3 and shall be used

in determining the Guidelines range for his offense of conviction).

As agreed upon by the parties in the plea agreement, Section 4C1.1 does not apply in this

case, because, as described in detail above and in the Statement of Offense filed in this case (ECF

No. 39), Snoots used violence in connection with his offense of conviction.

12

The U.S. Probation Office calculated Snoots's criminal history as Category I, which is not disputed. PSR ¶ 56. Accordingly, based on the parties' stipulated calculation of Snoots's total adjusted offense level, after acceptance of responsibility, at 25, Snoots's Guidelines imprisonment range is 57 to 71 months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Snoots's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Even against the backdrop of this unparalleled criminal offense, Snoots's violent conduct stands out, as his repeated attacks on police officers—including his participation in the exceptionally brutal attack on Officer Fanone—impeded police's efforts to defend the building against the relentless mob of the Lower West Terrace.

Prepared with a gas mask on top of his head, Snoots chose to enter the Tunnel, where he assaulted uniformed officers who were in a desperate struggle to block rioters from entering the United States Capitol. Snoots threw his body weight back and forth with the crowd, crushing the police line. He then joined efforts with another rioter, pressing a stolen USCP riot shield against the police. But his violence did not stop there; when another rioter pulled Officer Fanone away from the comparative safety of the police line and into the crowd of rioters on the Lower West

Terrace, shouting "I've got one!", Snoots placed his hand on Officer Fanone's back, helping to force him into the mob. Once Officer Fanone was at the mercy of the crowd, Snoots helped to restrain his right hand and arm as Officer Fanone was brutally assaulted by numerous other rioters, resulting in lasting injuries. The nature and circumstances of Snoots's relevant conduct were of the utmost seriousness, and fully support the government's recommended sentence of 71 months' incarceration.

### B.  Snoots's History and Characteristics

Snoots has no prior adult convictions or juvenile adjudications. *Id.* ¶¶ 54-55. However, his lack of prior criminal conduct is taken into account by his placement in Criminal History Category I.

Snoots is employed as an auto mechanic in Richmond, VA, where he lives with his wife and his 35-year-old disabled adult daughter. PSR ¶¶ 67-68, 92. Both Snoots's wife and daughter have ongoing medical needs, and other family members have expressed concerns about the burdens on his family that will be caused by his incarceration. *Id.* at ¶¶ 63, 67-69. The government notes that the ultimate responsibility for those burdens rests fully with one individual only: Snoots himself, who, knowing fully of his family members' substantial reliance upon him, chose nonetheless to go to the U.S. Capitol on January 6, 2021 and assault uniformed law enforcement officers. His family's needs were not on his mind at the time of his offenses, and those same needs do not now outweigh or mitigate his criminal conduct, which weighs heavily in favor of a lengthy term of incarceration.

**C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Snoots's criminal conduct on January 6 was the epitome of disrespect for the law. "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was, was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power." *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20.

**D.    The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[2] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a lengthy sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic

---

[2] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

processes we have: the peaceful transfer of power to a newly elected President. As we stand in the aftermath of another fiercely contested presidential election in 2024, the gravity of the offenses committed on January 6, 2021 demands significant sentences in order to properly establish deterrence against any future repetition of these kinds of grave offenses. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again.") There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Although Snoots has a criminal history category of I and has now expressed remorse and contrition, his statements in the recorded video interview taken after his assaults on January 6 were those of a man girding for future battles and undercut any statements of remorse Snoots makes now that he is facing the consequences of his conviction. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when

16

he took responsibility for his actions.") (statement of Judge Chutkan).

Snoots has accepted responsibility for his assault on officers inside the Tunnel (Count Two) through his guilty plea. He refused, however, to accept responsibility for his role in the brutal attack on Officer Fanone (Count Three). Indeed, on October 3, 2024, he refused to enter a scheduled guilty plea based on a statement of offense he previously signed in which he admitted his involvement in the Fanone assault. Snoots's efforts to minimize his role in one of the most harrowing assaults on January 6, coupled with his statements on January 6, 2021 that "it's not over," "it's just starting," and "every political asshole up in that place is now going to have a target on their back everywhere they go," demonstrate his sentence must be sufficient to provide specific deterrence from committing future crimes of violence.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national

sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[3] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol riot on January 6, 2021, many salient differences explain the differing recommendations and sentences.[4] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct of other defendants who participated in the assaults on Officer Fanone—resulting in sentences ranging from 50 to 151 months--provides suitable comparisons to the relevant sentencing considerations in this case.

Snoots's conduct is most analogous to that in *United States v. Kyle Young*, 21-cr-291-3 (ABJ). Like Snoots, Young assaulted officers in the Tunnel prior to his participation in the attack

---

[3] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

on Officer Fanone, including by throwing a speaker and jabbing a pole toward the police line. Young also held a strobe light toward the police officers trying to fend of the rioters in the tunnel and handed a taser to another rioter (Daniel Rodriguez, as discussed below). Young assaulted Officer Fanone by restraining his wrist and holding it away from his body at a pivotal moment in the attack on the Officer, amid chants to kill the officer with his own gun—much like Snoots, who also restrained Officer Fanone's arm and prevented him from being able to defend himself. Finally, Young assaulted Officer M.M., another officer who had been pulled into the crowd. All of these actions were taken in the presence of Young's minor son, who was with him that day on the grounds of the Capitol. Judge Berman Jackson sentenced Young to 86 months' incarceration following entry of a guilty plea to one count of assault in violation of 18 U.S.C. § 111(a). The government's recommended sentence of 71 months for Snoots—15 months lower than the sentence for Young—reflects an appropriate relationship between the sentences for two relatively similar defendants.

Another telling comparator is *United States v. Albuquerque Head*, 21-cr-291-2 (ABJ). There, the defendant, like Snoots, assaulted officers in the Tunnel multiple times by striking the police line with a riot shield. He also used a shield to press his weight against police officers on the front line in an effort to forcibly push them back. In the moments that followed, as Officer Fanone and his fellow officers pushed back the violent mob to the mouth of the tunnel, Head wrapped his arm around Officer Fanone's neck and emitted a triumphant yell to his fellow rioters—"I've got one!" As previously discussed, Head then forcibly dragged Officer Fanone into the riotous mob, isolating him as the crowd violently assaulted the officer. Head continued to

restrain Officer Fanone while rioter Daniel Rodriguez applied a taser to the base of the officer's skull. Head only let go when Officer Fanone reacted with enough force to free himself from Head's grip. Judge Berman Jackson imposed a 90-month term of incarceration on Head. Because Head initiated the attack on Officer Fanone, whereas Snoot joined it, a lower sentence for Snoot is appropriate.

Snoots's conduct warrants a longer sentence than the 50 months of incarceration the Court imposed in *United States v. Thomas F. Sibick*, 21-cr-291-1 (ABJ). Like Snoots, Sibick entered the Tunnel with other rioters seeking to push past the police line and into the Capitol Building. Sibick left the Tunnel after three minutes inside. Unlike Snoots, Sibick did not assault any police officers inside the tunnel. After Officer Fanone was dragged into the crowd of rioters, Sibick stole his MPD radio and badge. Sibick pled guilty to one count in violation of 18 U.S.C. § 111(a) and two counts in violation of 18 U.S.C. § 661. Unlike Snoots, Sibick had no role in Officer Fanone's being involuntarily dragged out of the Tunnel and pushed onto the Lower West Terrace. Unlike Snoots, Sibick's theft of Officer Fanone's radio and badge did not directly facilitate assaults on Fanone by other rioters or deprive Fanone of the ability to protect himself from those assaults.

Finally, Snoots's conduct warrants a shorter sentence than the 151 months of incarceration the Court imposed in *United States v. Daniel Rodriguez,* 21-cr-246 (ABJ). Like Snoots, Rodriguez assaulted officers in the Tunnel, including by deploying a fire extinguisher and shoving a wooden pole at the police line. He was then a more active participant in the attack on Officer Fanone; after Officer Fanone was dragged into the crowd on the Lower West Terrace, the defendant used a taser (handed to him by Kyle Young) to shock Officer Fanone at the base of his skull repeatedly from

behind. Unlike Snoots, Rodriguez also entered the Capitol Building, where he smashed a window using a wooden pole and stole federal property.

Like Young, Head, and Rodriguez, Snoots's actions involved both assaults against the officers inside the Tunnel and a significant role in the collective assaults on Officer Fanone on the Lower West Terrace and Fanone's resulting serious injuries. The government's requested sentence reflects this commonality, as well as the distinctions discussed above between Snoots and Sibick's respective actions that warrant a more severe sentence for the former. As a result, the instant recommendation does not constitute an unwarranted sentencing disparity.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[5] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Snoots must pay $2,000 in restitution, which reflects in part the role Snoots played in the riot on January 6.[6] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Snoots's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 129.

The parties also agreed that Snoots would pay restitution to all victims who suffered bodily injury as a result of his conduct, and Snoots might be required to pay some or all of the $96,927.18 in losses incurred by the Metropolitan Police Department for Officer Fanone's medical bills and medical leave.[7] Plea Agreement at ¶ 12. As previously discussed, Snoots's conduct facilitated

---

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

[7] As a result of Office Fanone's injuries, MPD paid for Officer Fanone's medical bills as well as paying for a significant period of medical leave. The medical bills totaled $29,205.30. The cost for Officer Fanone's medical leave totaled $67,721.88.

numerous assaults on Officer Fanone, resulting in significant injuries that included a minor heart attack, a traumatic brain injury, and post-traumatic stress disorder. A sentencing court must determine whether and how to impose restitution in a federal criminal case. 18 U.S.C. § 3556. Restitution in a case where, as here, multiple defendants caused harm, poses distinct challenges. *See United States v. Yalincak*, 30 F.4th 115, 121-22 (2d Cir. 2022). As a general matter, and while the government is not seeking it here, joint and several restitution liability is appropriate where "a set of wrongdoers acting in concert," *Paroline*, 572 U.S. at 454, inflict harm on the same victim at the same time. *See United States v. Monzel*, 641 F.3d 528, 538 (D.C. Cir. 2011) (noting that joint and several restitution liability may be appropriate "where there is more than one defendant and each has contributed to the victim's injury"). Borrowing from tort law, joint and several liability makes each defendant liable for the full amount of the harm that two or more defendants jointly cause, though the victim can recover only once for the full amount. *See Honeycutt v. United States*, 137 S. Ct. 1626, 1631 (2017); *United States v. Bronke*, No. 01-cr-532, 2022 WL 4119784, at *2 (N.D. Ill. Sep. 8, 2022); Restatement (Second) of Torts § 875 ("Each of two or more persons whose tortious conduct is a legal cause of a single and indivisible harm to the injured party is subject to liability to the injured party for the entire harm."). 18 U.S.C. Section § 3664(h) permits a sentencing court to impose joint and several liability in a restitution judgment: "If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for the payment of the full amount of restitution."

Two other approaches in cases with multiple defendants inflicting harm on a single victim are available. First, Section 3664(h) permits a sentencing court to "apportion liability among the

defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." In calculating the relative share of a defendant's responsibility for the total loss, "a formulaic methodology for computing the restitution award" is not required. *United States v. Monzel*, 930 F.3d 470, 480-81 (D.C. Cir. 2019). "What [is required] is that courts issue 'reasonable and circumscribed' awards." *Id.* at 481 (quoting *Paroline v. United States*, 572 U.S. 434 (2014), 134 S. Ct. at 1727)). "Beyond that . . . the district court's judgment 'cannot be a precise mathematical inquiry'; 'algorithm[s]' and 'rigid formula[s]' are not required." *Id.* (quoting *Paroline*, 134 S. Ct. at 1728). Alternatively, courts have recognized a "hybrid approach" that "combines the discretion and apportionment authority" in Section 3664(h) with joint-and-several liability and "accounts for multiple defendants' varying degrees of contribution to a victim's total loss, while also prioritizing the victim's likelihood of full recovery." *Yalincak*, 30 F.4th at 124; *see United States v. Sheets*, 814 F.3d 256, 260-61 (5th Cir. 2016). The hybrid approach thus allows a sentencing court to hold the "most significant offender" liable for the full loss, while requiring lesser participants to contribute lesser amounts. *Yalincak*, 30 F.4th at 124. Under the hybrid approach, "a defendant generally does not fully satisfy her restitution obligation until she either pays the amount apportioned to her individually or until the victim has been made whole for the entire harm." *United States v. Novikov*, No. 11-cr-89, --- F.Supp.3d ---, 2022 WL 3723118, at *3 (E.D. Pa. Aug. 30, 2022). Although multiple defendants may collectively bear greater restitution liability than the total amount of loss to the victim, "the government may not collect more from the defendants together than will make the victim whole." *Sheets*, 814 F.3d at 261 (citations omitted); *cf. United States v. Scott*, 270 F.3d 30, 52 (1st Cir. 2001).

Payment of proportionate restitution to MPD in this case is consistent with restitution law. First, each requested category of costs is appropriate where, as here, the case involves "an offense resulting in bodily injury to the victim." 18 U.S.C. § 3663(b)(2); 18 U.S.C. § 3663A(b)(2). The $29,205.30 in medical bills reflects "an amount equal to the cost of necessary medical and related professional services." § 3663(b)(2)(A); § 3663A(b)(2)(A). The $67,721.88 figure, which MPD paid to Officer Fanone as medical leave, reflects "income lost by such victim as a result of the offense." § 3663(b)(2)(C); § 3663A(b)(2)(C); *see United States v. Ferranti*, 928 F. Supp. 206, 224 (E.D.N.Y. 1996) (ordering restitution to a fire department that paid medical leave for the victim). Second, where, as here, the victim has "received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person that provided or is obligated to provide such compensation." § 3664(j)(i). It follows that the Court should hold Snoots responsible for his individual contribution to MPD's total losses resulting from Officer's Fanone's injuries by ordering Snoots to pay restitution to MPD for an amount proportionate to his "relative role" in the assaults on Officer Fanone.

## VIII. FINE

Snoots's convictions for violations of 18 U.S.C. § 111(a)(1) subject him to a statutory maximum fine of $250,000.00 *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, Snoots's financial assets set

forth in the PSR suggest that he is unable, and is unlikely to become able, to pay a fine. *See* PSR

¶ 107.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose

a sentence of 71 months' incarceration (the top of the 57-to-71 month guidelines range), three

years' supervised release, $2,000.00 in restitution to the Architect of the Capitol and restitution to

the Metropolitan Police Department in a proportionate amount reflecting Snoots's role in the

assaults on Officer Michael Fanone, and a mandatory special assessment of $100.00.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: /s/_____
Samuel White
Assistant United States Attorney
N.C. Bar No. 44908
United States Attorney's Office
District of Columbia
601 D St., NW
Washington, D.C. 20530
samuel.white@usdoj.gov
(202) 431-4453

/s/_____
Monika (Isia) Jasiewicz
Assistant United States Attorney
D.C. Bar No. 102491
United States Attorney's Office
District of Columbia
601 D Street NW
Washington, DC 20530

(202) 714-6446
isia.jasiewicz@usdoj.gov