**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**


| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 24-cr-00234-DLF** |
| | ) | |
| **LEWIS WAYNE SNOOTS,** | ) | |
| | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |


**DEFENDANT LEWIS WAYNE SNOOTS' SENTENCING STATEMENT**

William L. Shipley, Jr., Esq.
PO Box 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com

*Attorney for Defendant*

I.      Introduction

Comes now Defendant Lewis Wayne Snoots by and through his undersigned counsel of record, William L. Shipley Esq., and submits to this Court his Sentencing Statement in advance of the Sentencing Hearing on January 17, 2025.

Defendant Snoots appears for sentencing before this Court having pled guilty to Count Two of the Indictment, charging him with a violation of, 18 U.S.C. Sec. 111(a)(1) Assaulting, Resisting, or Impeding Certain Officers.

Defendant faces a statutory maximum penalty of up to 8 years imprisonment and a fine up to $250,000.

The Probation Officer has not completed his PSR therefore no recommendation has yet to be received.

II.     Sentencing Guidelines Calculation

The parties entered into a written plea agreement in this case and that agreement sets forth the agreement between the parties as to the application of the Sentencing Guidelines to this case.

The PSR adopts the agreement between the parties as to that calculation.

Count Two:  18 U.S.C. Sec. 111(a), assaulting a law enforcement officer --

| | |
|---|---:|
| **Base Offense Level:** | **14** |
| Specific Offense Characteristics: | +5 |
| Victim Related Adjustment: | +2 |
| Adjustment for Role in the Offense: | +6 |
| Adjustment for Obstruction of Justice: | 0 |
| Adjusted Offense Level **(Subtotal):** | **27** |
| Chapter Four Adjustment: | 0 |
| Acceptance of Responsibility: | -2 |

**Total Offense Level:**                                                                25

Based on an offense level of 25, and a criminal history score of 1, the Recommended Guideline Range is 57-71 months.

III.    The Offense Conduct.

The parties entered into an agreed upon "Statement of Offense" as part of the plea agreement.  The Probation Officer has accurately set forth the relevant facts in the Presentence Report.

IV.    Sentencing Factors Under Sec. 3553(a)

Pursuant to 18 U.S.C. § 3553(a), several factors are to be considered by the Court in formulating an appropriate sentence in this case.

The facts of this case, including the facts of the offense and factual circumstances pertinent to the Defendant's background and personal characteristics, should inform this Court with respect to the following issues to be considered pursuant to Sec. 3553(a):

1.    Nature and circumstances of the offense and the history and personal characteristics of the defendant.

a.  The Nature and Circumstances of the Offense.

For the most part, the events of the day on January 6 are not in dispute and need not be recounted here.  As Judges in this District have recognized after studying the events of January 6 in great detail, the crowd at the Capitol that day can be generally categorized as having three primary constituent parts:

1)  A relatively small group of individuals who came to the Capitol for the purpose and with the intent to engage in violence with the goal of disrupting the Congress's certification of the 2020 Electoral Vote.

2)  A larger number of protesters who intended to protest in a loud and raucous manner as a manifestation of their unhappiness and distrust with regard to the outcome of the election -- but with no predetermined intention of engaging in violence – some of whom were drawn into committing acts of violence once there; and

3) an even larger group who remained as spectators to what developed into a riot by members of the first two groups.  Some members of this third group entered the Capitol building, walked around, and then exited without incident.  Mr. Snoots fits within the second group.

As the Court will recall from the first attempt by Mr. Snoots to enter a plea of guilty in this case, his recollection of the critical events in this case is largely based on what he has been able to see in the video evidence provided to him through discovery.  His independent recollection of his actions has been diminished by the passage of time and the chaotic nature of the events as they unfolded.  He can see himself in the videos and he can see his actions, but he has no specific recollection(s) of his thought processes during those events.

Mr. Snoots entered the Lower West Terrace tunnel for the first time at approximately 3:14 pm.  This is approximately 25 minutes after the initial encounter between the protesters who entered the tunnel and the law enforcement officers who were initially stationed behind two sets of doors leading into the Capitol – the initial encounter took place at approximately 2:42

pm.  Over a period of nearly 45 minutes the crowd and the police were engaged in clash inside the tunnel, with each pushing against the other with little beneficial effect.  On an intermittent basis the crowd engaged in a "heave ho" type of coordination, rocking back and forth in an effort to use the combined mass of the protesters to push the police line backwards towards the doors leading to the interior of the Capitol.  These efforts were largely ineffective and the police gradually gained ground inside the tunnel until they were able to force all the protesters out of the mouth of the tunnel at approximately 3:20 pm.

As noted, Mr. Smoots entered the tunnel near the end of this sequence – at 3:14.  The police line had already advanced forward in the previous 35 minutes since the clash had begun.  Because of that it took Mr. Smoots only a minute to reach what was the "front" of the line of protesters, where he was almost immediately sprayed by police with pepper spray in his face.  Other protesters had come behind Mr. Smoots and while he was in that location the crowd engaged in the last of the "heave-ho" efforts to push the police line back. e blocked any movement forward, and other protesters who entered behind him blocking any retreat.

As the video shows, Mr. Smoots ends up pressed against the back of a gentleman named Frederico Klein.  Mr. Klein was using a police shield to press against the Officers directly in front of him, and Mr. Smoots put his hand on the shield from behind Mr. Klein.  Shortly after, Mr. Smoots assisted in preventing the Capitol Police from taking back possession of this shield by

working with others to pass it back out of the tunnel over the heads of the protesters behind him.

Within moments of finding himself near the front of the protesters in the tunnel, the police line took command and was pushing the protesters still in the tunnel back towards the entrance. As noted – and as shown in the video – this was accomplished at approximately 3:19 p.m.

The video shows that during the final moments, Mr. Smoots was turned around and facing the exit as the police behind him are effectively pushing him and the others out of the tunnel. In that sequence, Officer Fanone -- who was at the front of the police line – was separated when protesters ended up behind him in the chaotic push to drive them out of the tunnel. For a brief period of time Officer Fanone was directly in front of Mr. Smoots as all were being pushed out of the tunnel by the police behind them. Mr. Smoots put his hand on the upper back and shoulder of Officer Fanone. This was after Mr. Smoots have been sprayed in the face with OC spray.

As was clear during the first hearing, Mr. Smoots has no independent recollection of a Capitol Police Officer being in front of him. But the video is clear that Off. Fanone, wearing police equipment and a marked helmet, was the person in front of Mr. Smoots as the crowd was pushed out of the front of the tunnel. Mr. Smoots cannot say, at this time, that when the events unfolded at 3:18-3:19 pm nearly four years ago that he was not aware of the presence of a Capitol Police Officer directly in front of him. All he can say now is that he lacks any recollection of such awareness at that moment given the chaos all around him.

The Statement of Offense drafted by the Government is careful to say specifically that Albuquerque Head "dragged Officer Fanone out of the tunnel" while other law enforcement officers were advancing behind them.  It carefully declines to state – which Mr. Smoots appreciates – that Mr. Smoots was pushing Off. Fanone from behind when he placed his hand on Off. Fanone's shoulder.  Mr. Smoots does not have a recollection of that moment in time.

The video shows that it was Mr. Head who applied force to pull Off. Fanone away from the line of officers behind them and into the crowd.  Officer Fanone was violently assaulted and in some measure incapacitated by Mr. Head and other protesters.  He was not assaulted by Mr. Smoots.  Another individual wrestled with Off. Fanone for control of his firearm.  During this sequence of events, Mr. Smoots can see himself in the video grabbing the hand/forearm of Officer Fanone.  He has no recollection at this time of having done so, but he acknowledges what is shown on the video and accepts responsibility for his actions and the role his actions played in the injuries suffered by Off. Fanone.

b. <u>History and Personal Characteristics</u>.

Mr. Lewis Wayne Snoots was born on April 19, 1964, in Charlottesville, Virginia, to the marital union of Lewis Davis and Sue Snoots.  Mr. Snoots' father committed suicide when he was approximately six years old. The defendant's mother passed away in March of 2023 at the age of 78.

Mr. Snoots reported that his name at birth was Lewis Wayne Davis, Jr., however it was legally changed when his mother married his stepfather Art Snoots.  Mr. Snoots' biological father as an abusive alcoholic and he does not

have fond memories of the years before his suicide.  His mother married Art Snoots when he was 7 years old and he was legally adopted by Art Snoots.  Art Snoots is a Pastor living in Gordonsville, Virginia, is 82 years old, and is the only father figure that Mr. Snoots has ever known.

Mr. Snoots has two stepbrothers -- Shawn Snoots and Arthur Snoots, whose father is Art Snoots.  Shawn Snoots resides with his father and has required full-time care since birth due health complications at the time of his birth.  Arthur resides in Charlotte, North Carolina.

Following the marriage of Mr. Snoots' mother to Art Snoots, he had a positive childhood environment and upbringing. Mr. Snoots does not remember much from the time before his mother remarried, but remembers the situation as "pretty abusive," and added that it was "a night and day difference," when his mother remarried. Mr. Snoots' family was financially stable though not wealthy by any means.

Mr. Snoots graduated from Albemarle High School in Charlottesville, Virginia, in 1982. He is a skilled European Auto Mechanic and holds a Virginia State Vehicle Inspector license. To enhance his expertise, he attended various specialized training programs between 2006 and 2010, focusing on servicing European vehicle brands such as Audi, BMW, and Mercedes.

In 1985, Mr. Snoots expressed an interest in serving his country by enlisting in the United States Air Force. Unfortunately, due to a severe hand injury that required healing, he was unable to proceed with the enlistment process at that time and ultimately decided not to pursue it further.

Mr. Snoots has been gainfully employed since March 2017, he has as the Lead European Mechanic at Complete Automotive of Richmond, located in Richmond, Virginia.  Mr. Snoots has a long history of mechanic work-- prior to working at Complete Automotive, Mr. Snoots worked as a mechanic for seven years at Blue Ridge Motorworks, Charlottesville, Virginia and for almost thirteen years worked at Audi of Charlottesville Virginia as a mechanic.

Mr. Snoots married his wife Debra in 1985.  Mrs. Snoots is 58 years old and was diagnosed with Melanoma approximately four years ago.  The condition has now progressed into her bones.  She has limited use of her left arm and finds it very difficult to engage in normal everyday activities due to difficulty walking.

Mr. Snoots and his wife have one child, daughter Kristina Yvonne Snoots who is 35 years old.  She resides with the defendant and his wife.  Kristina has been permanently disabled both physically and mentally due to what is believed to have been an adverse reaction to a childhood vaccine.  When Kristina was an infant, the family took her Children's Hospital at the University of Virginia Medical Center, and Johns Hopkins Hospital in search of a definitive diagnosis and treatment for her condition.  The only "official" diagnosis ever offered was "failure to thrive."  However, a nurse at Johns Hopkins Hospital told Mr. Snoots and his wife that Kristina's condition was consistent with mercury poisoning from certain vaccines.  The nurse asked that they not share this information with anyone at the hospital because the nurse feared for her job.  But Mr. Snoots and his wife later received a similar diagnosis – "heavy metal poisoning" -- from a doctor in Richmond, Virginia.  Mr. Snoots' daughter

presents with the physical appearance of a girl around 12 years of age, even though she is 35 years old, and that she requires full-time care in their home. She was recently diagnosed with a "Cavernous Malformation" -- bleeding in her brain -- which is causing her to have severe seizures.  She is currently undergoing various types of treatment to reduce the frequency and severity of the seizures.

The defendant's stepfather is scheduled to have hip and knee surgery on January 7, 2025.  As a result, he will not be able to provide assistance to Mr. Snoots in helping to care for Mr. Snoots' wife and daughter as he has done for many years.  Mr. Art Snoots stated: "I don't know what Debbie and Kristy are going to do if he's incarcerated. He's never been arrested on in any kind of trouble. He's been an ideal son and breadwinner and has taken care of his family so well. I don't know how we're going to recover from this."

> 2.    The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

There are several comparative cases involving other defendants who engaged in similar conduct at the same time and place as Mr. Snoots.

In *United States v. McCaughey, III, et al.* 21-cr-00040-TMN, a multi-defendant case, Defendant Federico Klein was convicted at trial on multiple violations of 18 U.S.C. 111(a) and (b), and received a sentence of 70 months.

Defendant Stevens was convicted at trial on multiple violations of 18 U.S.C. 111(a) and (b) and received a sentence of 60 months.  Finally, Defendant Judd plead guilty to a violation of 18 U.S.C. 111(b) and received a sentence of 32 months.

In *United States v. Rodriguez*, 21-cr-0246-ABJ, Defendant Rodriguez plead guilty to a violation of 18 U.S.C. 111(b) and was sentenced to 150 months.

In *United States v. Sibick, et al.*, 21-cr-291-ABJ, another multi-defendant case, Defendant Head plead guilty to a violation of 18 U.S.C. 111(a)(1) and received a sentence of 90 months.  Defendant Young also plead guilty to a violation of 18 U.S.C. 111(a) and received a sentence of 86 months.

Mr. Snoots actions are far less egregious than any of the individuals above.

Klein, Stevens and Judd were all sentenced by Judge McFadden.  Klein was found guilty of having used a police shield in a manner that made it a dangerous weapon. Stevens was convicted of multiple counts at trial, did not benefit from "acceptance of responsibility," and his relevant conduct included a significant amount of activity outside the tunnel on the West Front Plaza earlier in the afternoon.

Judd pled guilty to a single count, but the factual basis for his guilty plea established that he was inside the tunnel for nearly 30 minutes and participated along with others in multiple efforts to break through the police line.  Judd also gave verbal commands to coordinate the efforts of those inside

the tunnel both in taking possession of police equipment like shields, and in coordinating the "heave-ho" efforts by the crowd.

Defendant Head pulled Officer Fanone from the tunnel and into the crowd where he was assaulted and injured. Defendant Rodriguez repeatedly used a taser on Officer Fanone. Defendant Young wrestled with Officer Fanone for possession of his firearm and encouraged others to assault him.

By contrast, Mr. Smoots was inside the tunnel for approximately 5 minutes; he had only momentary involvement with Mr. Klein regarding the police shield, and while he was in direct proximity to Officer Fanone and made physical contact with him, his contact did not result in any injuries to Officer Fanone.

## DEFENDANT'S SENTENCING RECOMMENDATION

Based on specific offense conduct here, and taking into consideration all the factors set forth by Congress in Section 3553(a) – and particularly taking into consideration the extraordinary medical needs of his wife and daughter for whom Mr. Snoots in the primary care provider -- a downward variance to Offense Level 11 is warranted. This would make Mr. Snoots eligible for a sentence of 36 months probation. The Court could then impose as a condition of that probation that he serve 18 months of home confinement, thereby allowing him to continue in his role of the primary care giver for his wife and daughter. This would be an extraordinary departure, but one that is justified by the extraordinary circumstances and medical needs of Mr. Snoots' family.

Dated: January 3, 2025        Respectfully submitted,

/s/ William L. Shipley
William L. Shipley, Jr., Esq.
PO BOX 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com